**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------×

JERMANIQUE C. BROWN,

     *Plaintiff,*        **17 CV 9324**

  *v.*

                **COMPLAINT**

BRIGHTPOINT HEALTH,

     *Defendant.*

------------------------------------------------------------------------×

   Plaintiff Jermanique C. Brown, by his counsel, The Harman Firm, LLP, alleges for his

Complaint against Defendant Brightpoint Health ("Brightpoint") as follows:

## PRELIMINARY STATEMENT

   1.  Mr. Brown seeks damages and costs against Brightpoint for discriminating

against him based on his disability by subjecting him to a hostile work environment, failing to

provide him with a reasonable accommodation, unlawfully interfering with his exercise of his

protected rights, and terminating his employment, in violation of the Americans with Disabilities

Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, and the New York City Human Rights Law (NYCHRL),

N.Y.C. Admin. Code §§ 8-101 *et seq.*

   2.  Mr. Brown also seeks damages and costs against Brightpoint for discriminating

against him based on his sexual orientation by subjecting him to a hostile work environment and

terminating his employment, in violation of the NYCHRL.

   3.  Mr. Brown also seeks damages and costs against Brightpoint for retaliating

against him for his complaints about disability discrimination and sexual orientation

discrimination, in violation of the ADA and NYCHRL.

4. Mr. Brown also seeks damages and costs against Brightpoint for tortiously interfering with his job search subsequent to his termination, in violation of the New York State common law.

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

5. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under the ADA.

6. Pursuant to 28 U.S.C. § 1332, this Court has supplemental jurisdiction over Plaintiff's NYCHRL and common law claims, as these claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

7. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

8. All conditions precedent to maintaining this action have been fulfilled. A charge of discrimination was filed with the Equal Employment Opportunity Commission (EEOC). The EEOC issued a Right-to-Sue letter dated August 31, 2017, relating to the discriminatory acts described in this Complaint. This action was properly instituted within 90 days of the issuance of the Right-to-Sue letter.

## TRIAL BY JURY

9. Plaintiff respectfully requests a trial before a jury.

## PARTIES

10. Mr. Brown, at all times relevant hereto, was and is a resident of Kings County in the State of New York.

11.     Upon information and belief, at all times relevant hereto, Brightpoint was and is a not-for-profit corporation organized under the laws of the State of New York with headquarters located at 71 West 23rd Street, Eighth Floor, New York, New York 10010 in New York County and a location at 248 West 35th Street, Eighth Floor, New York, New York 10001 in New York County.

## STATEMENT OF FACTS

12.     On or about October 16, 2014, Brightpoint hired Mr. Brown for a temporary two-week position as Executive Assistant to Paul Vitale, Brightpoint's President and CEO.

13.     Mr. Brown, a bisexual and biracial man, was glad to be able to work for Brightpoint, in large part because of its mission to serve minority and marginalized communities.

14.     On or about October 22, 2014, Mr. Brown, who has epilepsy, experienced a myoclonic seizure[1] at Brightpoint during a senior leadership retreat with his colleagues and supervisors, including Mr. Vitale.

15.     Mr. Brown's seizure caused him symptoms including uncontrollable muscle jerking, difficulty standing, and difficulty keeping his hands steady.

16.     Mr. Brown's coworkers quickly noticed Mr. Brown's symptoms and asked Mr. Brown what was wrong.

17.     Mr. Brown then informed Mr. Vitale that he had epilepsy.

18.     Mr. Vitale responded, "It's no problem, just let me know what you need," and asked Mr. Brown if he needed to go home from the event.

---

[1] Myoclonic seizures involve brief, rapid jerking movements of a muscle or a group of muscles, typically in the limbs or face.  Individuals experiencing myoclonic seizures typically remain awake and able to think clearly.

19.     Throughout the remainder of his temporary placement period, Mr. Brown's job performance was excellent.

20.     Mr. Vitale and Brightpoint acknowledge that Mr. Brown's performance as one of Mr. Vitale's executive assistants was more than satisfactory.

21.     As a result, at the conclusion of Mr. Brown's two-week temporary assignment as Executive Assistant to Mr. Vitale in and around early November 2014, Brightpoint offered Mr. Brown a full-time position as Executive Assistant to Christopher Quinones, Brightpoint's recently hired Chief Administrative Officer, which Mr. Brown accepted.

22.     On or about November 17, 2014, Mr. Brown began his full-time position as Mr. Quinones's Executive Assistant.

23.     As Mr. Quinones's Executive Assistant, Mr. Brown was responsible for managing Mr. Quinones's calendar, travel schedule, and correspondence.

24.     On or about April 10, 2015, Mr. Brown suffered another seizure at work.

25.     After this seizure, Mr. Brown informed Mr. Quinones that he had epilepsy and explained his symptoms, as well as various side effects of Topamax, the anticonvulsant medication that Mr. Brown is prescribed to treat his epilepsy.

26.     After learning about Mr. Brown's disability, Mr. Quinones began to discriminate against Mr. Brown.

27.     Mr. Quinones instructed Mr. Brown to increase his daily Topamax dosage, for no other reason than that Mr. Quinones did not want to deal with Mr. Brown's disability symptoms.

28.     Mr. Brown's doctor cautioned Mr. Brown against increasing his Topamax dose, warning him that doing so could adversely affect his condition and cause additional side effects.

29.     Afraid for his job after Mr. Quinones's open hostility towards his disability and its symptoms, however, Mr. Brown increased his Topamax dose against his doctor's recommendation.

30.     On or about May 6, 2015, Mr. Brown experienced a tonic-clonic[2] seizure while working at Brightpoint's headquarters.

31.     Mr. Brown was taken to the hospital as a result of this seizure.

32.     Several Brightpoint employees, including Mr. Quinones, accompanied Mr. Brown to the hospital.

33.     At the hospital, Mr. Quinones met Mr. Brown's male partner, who had been summoned as Mr. Brown's emergency contact.

34.     After Mr. Brown's hospitalization, his doctors determined that his seizure had been caused by his taking more anticonvulsant medication than was necessary or safe.

35.     On or about May 11, 2015, Mr. Brown returned to work.

36.     Upon Mr. Brown's return to work, Mr. Quinones told Mr. Brown that he "didn't believe" that Mr. Brown had epilepsy.

37.     Mr. Quinones then told Mr. Brown he could not return to work until he provided a doctor's note to "prove" that he had epilepsy, as well as a medication prescription.

38.     Mr. Brown complied with Mr. Quinones's directive and returned to work with the requested note from his doctor.

39.     When Mr. Brown returned, Brightpoint called Mr. Brown to a meeting with Mr. Quinones, Lisa DeRoche (Vice President of HR), and Marie Hastreiter (HR Specialist).

---

[2] Also known as *grand mal* seizures, tonic-clonic seizures are a very severe form of generalized seizure which affects the entire brain.  Tonic-clonic seizures involve muscle stiffening, loss of consciousness, and difficulty breathing, followed by rapid muscle spasms and jerks.

40.     In this meeting, Mr. Brown requested several accommodations for his epilepsy: a flexible start time[3]; a place to rest and recover if he experienced a seizure while at work; and occasional time off from work to accommodate his need to attend doctors' appointments and obtain treatment for flare-ups of his condition.

41.     Mr. Brown also made clear that he needed Brightpoint's understanding going forward that the side effects of epilepsy medications often impact mood and demeanor, meaning that, when his medication or treatment was in flux, Mr. Brown might speak or act in a rude or otherwise abnormal manner.

42.     Instead of addressing Mr. Brown's request for reasonable accommodations, however, Mr. Quinones, Ms. DeRoche, and Ms. Hastreiter refocused the conversation on purported deficiencies in Mr. Brown's job performance.

43.     Brightpoint reprimanded Mr. Brown for purported rude and inappropriate comments, rather than addressing them as a symptom of his disability and medication-related side effects.

44.     Mr. Brown never received any response from Mr. Quinones, Ms. DeRoche, Ms. Hastreiter, or anyone else at Brightpoint to his request for reasonable accommodations.

45.     Further, Mr. Quinones's discriminatory treatment of Mr. Brown intensified after Mr. Brown's requests for reasonable accommodations.

46.     By early June 2015, Mr. Quinones had become openly hostile and antagonistic towards Mr. Brown.

47.     Mr. Quinones regularly yelled and screamed at Mr. Brown in the workplace.

---

[3] Mr. Brown's epilepsy can be worse in the morning and late evenings.  His request for a flexible start time stemmed from the fact that his morning myoclonic seizures can make him late for work.

48.    For example, Mr. Quinones shouted that Mr. Brown was "fucking crazy" in front of Mr. Brown's coworkers.

49.    Mr. Quinones would yell at Mr. Brown for yawning in the workplace, even though he was aware that Mr. Brown's medication caused drowsiness.

50.    Mr. Quinones's conduct intimidated and humiliated Mr. Brown and had the effect of ostracizing him from his colleagues

51.    Mr. Quinones scrutinized Mr. Brown's work and fabricated supposed errors, belittling Mr. Brown for not doing projects "perfectly."

52.    Mr. Quinones did not treat any other employees in this way.

53.    Further, Mr. Quinones assigned Mr. Brown projects that he knew were outside of Mr. Brown's job duties and areas of expertise in an attempt to set him up for failure.

54.    On or about June 8, 2015, Brightpoint transferred Mr. Brown from his Executive Assistant position to a Support Services Facilities Coordinator position in Brightpoint's Facilities Department.

55.    Brightpoint transferred Mr. Brown because of his disability, side effects of his medication, and Mr. Quinones's continued hostility towards him.

56.    Mr. Brown did not want to transfer to the Facilities Department, but accepted Brightpoint's decision.

57.    As part of the transfer, Mr. Brown moved from Brightpoint's 71 23rd Street location to its 248 West 35th Street location and began reporting to Alberto Sandoval, Brightpoint's Director of Environmental Services.

58.    Mr. Sandoval is a close friend of Mr. Quinones.

59.     Mr. Sandoval, like Mr. Quinones, discriminated against Mr. Brown based on his disability.

60.     In addition, Mr. Brown now began to experience discrimination on the basis of his sexual orientation from Mr. Sandoval and his coworkers in the Facilities Department.

61.     For example, Mr. Brown's coworker, Steven Williams, was openly hostile to Mr. Brown and alleged to Brightpoint's management that Mr. Brown had made inappropriately sexual comments towards him.

62.     Mr. Williams claimed that Mr. Brown had made these comments during and after a company event.

63.     During the company event in question, Mr. Brown was wearing extensive medical monitoring equipment on his head as part of a treatment for his seizures, which involved adjusting Mr. Brown's medication and observing the effects on his brain.

64.     In response to Mr. William's accusation that Mr. Brown had made inappropriate advances on him, Brightpoint again did not address the matter of Mr. Brown's disability or the effect of his treatment.

65.     Instead, Brightpoint interrogated and criticized Mr. Brown and issued him a written warning.

66.     In addition, even after Mr. Brown's transfer, Mr. Quinones continued to find ways to target Mr. Brown and subject him to discrimination and harassment.

67.     For example, in and around August 2015, Mr. Quinones issued Mr. Brown a specious and pretextual write-up for purported performance deficiencies.

68.     Mr. Quinones had no grounds to evaluate Mr. Brown's performance, as Mr. Quinones was no longer Mr. Brown's direct supervisor and, at this point, generally interacted with Mr. Brown no more than once a week.

69.     Mr. Brown contested the write-up, but Brightpoint refused to listen to him or consider the evidence he provided.

70.     Instead, Brightpoint placed Mr. Brown on a "final" warning.

71.     On or about December 9, 2015, Brightpoint called Mr. Brown to a meeting with Mr. Sandoval and Carolina Nieto, Brightpoint's Director of HR.

72.     In this meeting, Mr. Brown reiterated his request for reasonable accommodations for his epilepsy.

73.     Ms. Nieto represented that Brightpoint would provide Mr. Brown's first requested accommodation—a flexible start time—and told Mr. Brown that she would speak with Mr. Sandoval to explain the requested accommodation.

74.     Ms. Nieto did not address Mr. Brown's request for a place to rest and recover if he had a seizure on the job or his request for medical leave.

75.     Nor did Ms. Nieto address the impact that Mr. Brown's medication had on his demeanor or the connection between this effect and Brightpoint's prior discipline of Mr. Brown.

76.     After this meeting, Mr. Sandoval's treatment of Mr. Brown grew worse.

77.     Mr. Sandoval continued to belittle, ostracize, and harass Mr. Brown because of his disability and sexual orientation.

78.     Mr. Sandoval now began making openly discriminatory comments about Mr. Brown's sexual orientation.

79.    Mr. Sandoval targeted Mr. Brown with homophobic slurs, calling him a "fucking faggot."

80.    On or about January 28, 2016, Mr. Brown wrote a letter to Mr. Vitale, complaining about Mr. Sandoval's discrimination and harassment and requesting a different supervisor.

81.    Mr. Vitale responded that same day, telling Mr. Brown that "Brightpoint Health takes all of these issues very seriously" and assuring Mr. Brown that Ms. DeRoche would "investigate all these issues" and "follow up with next steps."

82.    On or about the following day, January 29, 2016, Mr. Brown met with Ms. DeRoche and described Mr. Sandoval's discriminatory and retaliatory conduct.

83.    Like Mr. Vitale, Ms. DeRoche assured Mr. Brown that Brightpoint would "follow up with the next steps."

84.    Mr. Brown heard nothing further until on or about February 11, 2016, when Ms. DeRoche called him to a second meeting.

85.    In this meeting, Ms. DeRoche told Mr. Brown that no one could corroborate his "story" and trivialized Mr. Sandoval's discriminatory comments as "joking."

86.    Ms. DeRoche then explicitly chastised Mr. Brown for complaining about discrimination, accusing him of "misrepresenting" Mr. Sandoval's behavior to HR and instructing him to "work on relationship building."

87.    Ms. DeRoche then made several baseless, discriminatory "criticisms" of Mr. Brown—namely, that he was too "touchy-feely" and needed to be more "resilient."

88.    Shortly after Mr. Brown's meeting with Ms. DeRoche, Mr. Sandoval called Mr. Brown to another meeting.

89.     In this meeting, Mr. Sandoval rejected Mr. Brown's requested accommodation for a flexible start time without explanation, telling Mr. Brown, "I understand you want flex hours, but your hours are nine to five, and that's final."

90.     On or about February 17, 2017, Mr. Brown's doctor wrote a note to Brightpoint, confirming that Mr. Brown has epilepsy and takes anticonvulsant medication for his condition and detailing procedures for Brightpoint to follow whenever Mr. Brown has a seizure.

91.     Brightpoint ignored this doctor's note.

92.     At this point, many of Brightpoint's employees were aware of Mr. Brown's disability and sexual orientation, as well as the complaints he had made to Brightpoint.

93.     Another Brightpoint employee, Franz Stinson, approached and violently berated Mr. Brown at work.

94.     Several other employees made offensive and discriminatory comments to and about Mr. Brown.

95.     Mr. Brown repeatedly complained to Brightpoint HR about this discriminatory conduct.

96.     Several employees, particularly those in Brightpoint's Manhattan Health and Home department, began to retaliate against Mr. Brown for going to HR by harassing him at work and filing false complaints against him.

97.     Philip Vasquez, a Brightpoint employee who worked with Mr. Brown, told Mr. Brown that he hoped that Mr. Brown died of a seizure in his sleep and followed Mr. Brown down the street for multiple city blocks while cursing at him.

98.     Mr. Brown met with Ms. Nieto and Ms. DeRoche to complain about the incident with Mr. Vasquez.

99.     During this meeting—far from addressing the serious situation Mr. Brown had reported—Brightpoint instead subjected Mr. Brown to a discriminatory, harassing interrogation about his relationship with Mr. Vasquez.

100.    Ms. Nieto and Ms. DeRoche asked Mr. Brown, "Are you having sex with Philip Vasquez?"

101.    Mr. Brown, dumbfounded, responded that he was not.

102.    Mr. Brown then informed Ms. Nieto and Ms. DeRoche that he had filed an EEOC charge pertaining to the constant discrimination he faced at Brightpoint.[4]

103.    Ms. DeRoche immediately suspended Mr. Brown without explanation.

104.    Only days later, Brightpoint terminated Mr. Brown's employment.

105.    To justify Mr. Brown's termination, Brightpoint cited the false reports made in retaliation against Mr. Brown.

106.    Mr. Brown attempted to address these claims, but Brightpoint would not allow him to contest its decision.

107.    Brightpoint has also tortiously interfered with Mr. Brown's efforts to find employment subsequent to his termination from Brightpoint.

108.    Brightpoint has reached out to individuals who wrote letters of recommendation for Mr. Brown in an effort to silence them.

109.    Individuals with intimate knowledge of Mr. Brown's difficulties at Brightpoint have posted defamatory statements on Mr. Brown's LinkedIn page referring to his sexual orientation.

---

[4] Mr. Brown filed his EEOC charge on or about May 15, 2017.  The EEOC served notice of Mr. Brown's charge on Brightpoint on or about May 25, 2017.

110.    Mr. Brown has progressed through the application and interview process at multiple institutions and referral services, only to be denied.

111.    Mr. Brown later learned that these institutions and the recruiting service he used have informal ties with executives, management, and human resources employees at Brightpoint.

112.    Upon information and belief, Brightpoint and its representatives interfered with Mr. Brown's job search and employment after terminating him.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
**Hostile Work Environment Based on Disability**
**in Violation of the ADA**

113.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 112 with the same force as though separately alleged herein.

114.    The ADA prohibits an employer from discriminating against a qualified individual with a disability in terms, conditions, and privileges of employment.

115.    Brightpoint violated the ADA when it subjected Mr. Brown to a hostile work environment based on his disability, including making disparaging comments about Mr. Brown's disability and need for accommodations, treating Mr. Brown less well than non-disabled employees, and subjecting Mr. Brown to different policies and procedures.

116.    As a direct and proximate consequence of Brightpoint's disability discrimination, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

117.    Brightpoint's discriminatory treatment of Mr. Brown was willful and in reckless disregard of Mr. Brown's protected rights.

118.    Pursuant to 42 U.S.C. §§ 12117 and 12205, Mr. Brown is entitled to an award of back pay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation
### in Violation of the ADA

119.  Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 118 with the same force as though separately alleged herein.

120.  The ADA requires an employer to engage in an interactive process to identify reasonable accommodations for an otherwise qualified employee with a disability.

121.  Brightpoint violated the ADA when it refused to grant Mr. Brown's requests for reasonable accommodations for his disability and failed to engage in the mandatory interactive process to provide a reasonable accommodation for Mr. Brown's disability.

122.  As a direct and proximate consequence of Brightpoint's failure to accommodate his disability, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

123.  Brightpoint's discriminatory treatment of Mr. Brown was willful and in reckless disregard of Mr. Brown's protected rights.

124.  Pursuant to 42 U.S.C. §§ 12117 and 12205, Mr. Brown is entitled to an award of back pay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
### Unlawful Termination Based on Disability
### in Violation of the ADA

125.  Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 124 with the same force as though separately alleged herein.

126.  The ADA prohibits an employer from discriminating against a qualified individual with a disability in terms, conditions, and privileges of employment, including hiring and termination.

127.    Brightpoint violated the ADA when it terminated Mr. Brown based on his disability.

128.    As a direct and proximate consequence of Brightpoint's disability discrimination, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

129.    Brightpoint's discriminatory treatment of Mr. Brown was willful and in reckless disregard of Mr. Brown's protected rights.

130.    Pursuant to 42 U.S.C. §§ 12117 and 12205, Mr. Brown is entitled to an award of back pay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Interference
### in Violation of the ADA

131.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 130 with the same force as though separately alleged herein.

132.    The ADA provides that an employer may not "coerce, intimidate, threaten, or interfere with" an employee's exercise of their rights under the ADA or on account of the employee's having exercised their rights under the ADA.

133.    Mr. Brown exercised his protected rights under the ADA when he requested reasonable accommodations for his disability.

134.    Brightpoint violated the ADA when it interfered with Mr. Brown's exercise of his ADA-protected rights by subjecting him to further discrimination and harassment and terminating his employment because of his requests for reasonable accommodations.

135.    As a direct and proximate consequence of Brightpoint's ADA interference, Mr.

Brown has suffered, and continues to suffer, substantial damages, including, but not limited to,

emotional distress and suffering, all in amounts to be determined at trial.

136.    Pursuant to 42 U.S.C. §§ 12117 and 12205, Mr. Brown is entitled to an award of

back pay, front pay, compensatory damages, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**Retaliation**
**in Violation of the ADA**

137.    Plaintiff hereby realleges and incorporates each and every allegation contained in

paragraphs 1 through 136 with the same force as though separately alleged herein.

138.    The ADA prohibits an employer from retaliating against an employee because

that employee has "opposed any act or practice" made unlawful under the ADA.

139.    Mr. Brown engaged in protected activity under the ADA when he complained to

Brightpoint about discriminatory treatment unlawful under the ADA.

140.    Brightpoint violated the ADA when it retaliated against Mr. Brown for his

complaints about discrimination by subjecting him to further discrimination and harassment and

terminating his employment.

141.    As a direct and proximate consequence of Brightpoint's retaliation, Mr. Brown

has suffered, and continues to suffer, substantial damages, including, but not limited to,

emotional distress and suffering, all in amounts to be determined at trial.

142.    Pursuant to 42 U.S.C. §§ 12117 and 12205, Mr. Brown is entitled to an award of

back pay, front pay, compensatory damages, and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### Hostile Work Environment Based on Disability and Sexual Orientation
### in Violation of the NYCHRL

143.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 142 with the same force as though separately alleged herein.

144.     The NYCHRL prohibits an employer from discriminating against an employee in compensation, terms, conditions, or privileges of employment on the basis of that employee's disability or sexual orientation.

145.     Brightpoint violated the NYCHRL by subjecting Mr. Brown to a hostile work environment based on his disability and sexual orientation, including making discriminatory comments and treating him less well than his non-disabled and heterosexual counterparts.

146.     As a direct and proximate consequence of Brightpoint's disability and sexual orientation discrimination, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

147.     Brightpoint's discriminatory treatment of Mr. Brown was willful and in reckless disregard of Mr. Brown's protected rights.  Accordingly, Mr. Brown is entitled to an award of punitive damages against Brightpoint.

## SEVENTH CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation
### in Violation of the NYCHRL

148.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 147 with the same force as though separately alleged herein.

149.     The NYCHRL requires an employer to make reasonable accommodations for an otherwise qualified employee with a disability.

17

150.    Brightpoint violated the NYCHRL when it refused to grant Mr. Brown's requests for reasonable accommodations for his disability and failed to engage in the mandatory interactive process to provide a reasonable accommodation for Mr. Brown's disability.

151.    As a direct and proximate consequence of Brightpoint's failure to accommodate his disability, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

152.    Brightpoint's discriminatory treatment of Mr. Brown was willful and in reckless disregard of Mr. Brown's protected rights.

153.    Mr. Brown is entitled to an award of back pay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
### Unlawful Termination Based on Disability and Sexual Orientation in Violation of the NYCHRL

154.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 153 with the same force as though separately alleged herein.

155.    The NYCHRL prohibits an employer from discriminating against an employee in compensation, terms, conditions, or privileges of employment on the basis of that employee's disability or sexual orientation.

156.    Brightpoint violated the NYCHRL by terminating Mr. Brown's employment based on his disability and sexual orientation.

157.    As a direct and proximate consequence of Brightpoint's disability and sexual orientation discrimination, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

158.     Brightpoint's discriminatory treatment of Mr. Brown was willful and in reckless disregard of Mr. Brown's protected rights.  Accordingly, Mr. Brown is entitled to an award of punitive damages against Brightpoint.

## NINTH CAUSE OF ACTION
### Interference
### in Violation of the NYCHRL

159.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 158 with the same force as though separately alleged herein.

160.     The NYCHRL provides that an employer may not interfere with an employee's exercise of their rights under the NYCHRL or on account of the employee's having exercised their rights under the NYCHRL.

161.     Mr. Brown exercised his protected rights under the NYCHRL when he requested reasonable accommodations for his disability.

162.     Brightpoint violated the NYCHRL when it interfered with Mr. Brown's exercise of his NYCHRL-protected rights by subjecting him to further discrimination and harassment and terminating his employment because of his requests for reasonable accommodations.

163.     As a direct and proximate consequence of Brightpoint's NYCHRL interference, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

164.     Mr. Brown is entitled to an award of back pay, front pay, compensatory damages, and attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**Retaliation**
**in Violation of the NYCHRL**

165.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 164 with the same force as though separately alleged herein.

166.    The NYCHRL prohibits an employer from retaliating against an employee for engaging in protected activity under the NYCHRL.

167.    Mr. Brown engaged in protected activity under the NYCHRL when he properly complained to Brightpoint about disability and sexual orientation discrimination unlawful under the NYCHRL.

168.    Brightpoint retaliated against Mr. Brown by subjecting him to further discrimination and harassment and terminating his employment.

169.    As such, Brightpoint has violated the NYCHRL.

170.    As a direct and proximate consequence of Brightpoint's retaliation, Mr. Brown has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
**Tortious Interference with Business Relations**
**in Violation of the New York State Common Law**

171.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 170 with the same force as though separately alleged herein.

172.    Mr. Brown and Brightpoint had a business relation: Brightpoint employed Mr. Brown.

173.    Brightpoint had full knowledge of that employment relation.

174.    Outside of the scope of its authority, Brightpoint interfered with Mr. Brown's career by sabotaging Mr. Brown's job search subsequent to his termination from Brightpoint.

175.    As a direct and proximate consequence of Brightpoint's tortious interference with his business relations, Mr. Brown has suffered actual economic damages, all in amounts to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

    A.  For the first cause of action, damages to be determined at trial;

    B.  For the second cause of action, damages to be determined at trial;

    C.  For the third cause of action, damages to be determined at trial;

    D.  For the fourth cause of action, damages to be determined at trial;

    E.  For the fifth cause of action, damages to be determined at trial;

    F.  For the sixth cause of action, damages to be determined at trial;

    G.  For the seventh cause of action, damages to be determined at trial;

    H.  For the eighth cause of action, damages to be determined at trial;

    I.  For the ninth cause of action, damages to be determined at trial;

    J.  For the tenth cause of action, damages to be determined at trial;

    K.  For the eleventh cause of action, damages to be determined at trial; and

    L.  For such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            November 28, 2017

                  By:    s/ Walker G. Harman, Jr.
                       Walker G. Harman, Jr. [WH-8044]
                       Owen H. Laird [OL-6994]
                       THE HARMAN FIRM, LLP
                       220 Fifth Avenue, Suite 900
                       New York, NY 10001
                       (212) 425-2600
                       wharman@theharmanfirm.com
                       olaird@theharmanfirm.com

                       *Attorneys for Plaintiff*